## CHATTANOOGA, ROME & COLUMBUS R. R.
## COMPANY, to use, etc., v. WARTHEN.

1. A subscription to the capital stock of a railroad company being a chose in action and assignable, the assignee can enforce its payment under any circumstances where the company could do so. The question of the defendant's liability in the present case is dealt with as if the action had been brought by the company for its own benefit, instead of for the use of the assignee.

2. A written contract of subscription to the capital stock of a railroad company, which provides that it shall be null and void "unless the main line of said railroad, when built, shall pass through the corporate limits" of a named town, confers upon the company the right to construct the road upon any line or route through the town.

3. Though it may have been the right of the defendant against whom an action was brought upon such a contract to plead that the company had agreed with him to locate and build its railroad upon a specified and described route through the town, but had failed to do so, building it instead upon another and different route within the corporate limits, the defense thus made could not be supported by parol evidence of conversations or interviews had with the company's officers or agents before the execution of the contract, such evidence being inadmissible to contradict, vary or explain the written instrument, which, as to this matter, was plain and unambiguous.

4. Mere statements or promises by the company's officers or agents, made before the contract of subscription was signed, to the effect that the railroad would be built upon a certain line, and a failure to so build it after the contract was executed, would not constitute a fraud upon the subscriber or afford him any ground for avoiding payment, there being no contention that anything was omitted from the writing which was intended to be inserted therein. In the present case, there was no evidence of any fraud whatever.

5. The subscription being payable to the railroad company, "its associates, successors or assigns," and it having the right under its charter to sell all its property and franchises to any other railroad company, it was the right of the subscriber, in case of such sale and upon payment of his subscription thereafter, to receive stock in the successor company; and even were it otherwise, if such a sale was made and afterwards rescinded, it would count for nothing upon the question of the subscriber's liability.

6. Where the company's property and franchises had been placed in the hands of a receiver, a delivery by the latter of the stock

upon payment of the subscription would be valid, and it was competent for the plaintiff whose usee held the subscription contract under successive assignments, to prove that the stock was ready for delivery and would be delivered on payment for the same. That the stock had no value was immaterial.

7. Although a legislative amendment to the charter of a railroad company may contain provisions making radical and material changes therein, this affords no reason for avoiding payment of a stock subscription when there is no evidence that this amendment was ever accepted or acted upon by the company; and especially is this so when it appears that, before the trial of the action, this amendment had, by its own terms, become inoperative.

8. Where a railroad company, by its existing charter, had authority to build numerous, important and costly extensions, and to construct branch lines without limit as to number, provided no one of them should exceed twenty miles in length, its acceptance under the act of December 29, 1890, of the provisions of sections 1689(i) to 1689(gg) of the code, was not such a variation of its charter as would release a subscriber for its stock from his contract to pay for the same. Section 1689(m) would not authorize the removal of a railroad track already constructed in a town entirely beyond the corporate limits thereof.

9. In so far as the trial judge in his rulings upon demurrers to pleas, in admitting or rejecting evidence, or in charging the jury, failed to conform to what is above announced, error was committed. The next trial should be had in accord with what is here laid down as the law applicable to this case.

June 18, 1896. By two Justices. Argued at the last term.

Action on stock subscription. Before Judge Milner. Walker superior court. August term, 1894.

The Chattanooga, Rome & Columbus Railroad Company, suing for the use of J. U. Jackson, by its petition alleged: N. G. Warthen is indebted to Jackson $2,900, besides interest, upon a written promise to pay the same, copy of which is attached. Warthen therein subscribed $2,900, being the par value of 29 shares of the capital stock of the Chattanooga, Rome & Columbus Railroad Company, and promised to pay the same as set forth in said contract. Other citizens also signed the contract, agreeing to pay other and various amounts set opposite their names. (This contract is set forth in full in the opinion of the

court.)   The Chattanooga, Rome & Columbus Railroad
Company, formerly the Rome & Carrollton Railroad Com-
pany, for value received transferred and assigned said con-
tract and subscription to C. M. Hillman, in writing, who
afterwards transferred and assigned the same for a valuable
consideration to the Rome & Carrollton Construction Com-
pany, a corporation duly incorporated under the laws of
Connecticut, which on February 13, 1891, being in em-
barrassed circumstances, in pursuance of the statutes of
Connecticut, made an assignment for the benefit of its
creditors to E. T. McDonald, trustee.   On February 20,
1892, the latter was duly authorized to sell and transfer
said contract, along with other property of the construction
company, by the court of probate for the district of Stam-
ford, Conn., which court has jurisdiction of said matters.
On March 30, 1892, in pursuance of said authority, he
sold the same at public auction, and on the same day, in
writing, transferred and assigned the same to J. F. Under-
hill, the highest bidder, for $150.   On June 24, 1892, in
writing, Underhill for a valuable consideration transferred
and assigned said contract to Jackson.   The main line of
said railroad company was built and passes through the
town of LaFayette and the corporate limits thereof.   In
June, 1888, the cars commenced running from a point at or
near Rome through the counties mentioned in said contract
to Chattanooga, Tenn., over a road built by said company.
Defendant refused to pay 25 per cent. of said sum sub-
scribed by him, upon November 15, 1888, or to give his
notes for the remaining 75 per cent., one third of which to
become due every six months after November 15, 1888,
and continues to refuse to pay said sums or any part thereof
or to give his notes therefor, although duly demanded.
Said railroad company complied with every condition pre-
cedent in the contract, in accordance with the terms there-
of, and stood and stands ready to comply with all other con-
ditions therein specified.

In addition to the general issue, defendant filed nine special pleas to which plaintiff demurred. The pleas numbered 2 and 3 were stricken, but the demurrer was overruled as to the others. To the refusal to strike the latter plaintiff excepted.

The pleas not stricken were as follows: (1) The subscription was to be null and void unless the main line of the railroad when built should pass through the corporate limits of LaFayette. This condition was not complied with, and the railroad does not pass through the corporate limits as understood and agreed to by defendant. It was understood and agreed by and between the railroad company and the defendant, that the railroad should be built upon the grade of an old railroad which passes near the center of the town, and the condition above quoted was understood and agreed upon by the parties as meaning that the road should be located upon said old grade, or upon a line equally near the center of the town. The road was constructed outside the corporate limits, or, if within the limits, upon the very edge thereof, and this was only a colorable compliance with said conditions, and fraudulent, and in violation of the terms of said agreement and subscription, and this fraudulent conduct of the railroad company releases defendant. (4) After the alleged transfer by Hillman to said construction company, said construction company, by its contract and agreement with the railroad company for the building and equipment of said railroad, had the sole and exclusive right and power granted it by said railroad company to locate the railroad at such place or places as it, the construction company, saw proper. After having this right so given it, and after the alleged transfer by Hillman, the construction company contracted with Robert Dougherty and A. L. Snow that the main line of the railroad should be located in the extreme western limits of the town, or without the limits of the town, for a valuable consideration, and this contract was made to defraud defendant and to build up a section

not then included in the corporate limits, and to lessen the market value of defendant's property, which was located centrally and east of the town.   By this contract the construction company became the owners of fifty-five one hundredths of about 300 acres immediately west of the town, and half of 350 acres south of the first tract, worth some $25,000.   The construction company, wholly regardless of defendant's right under the contract sued on, located its line on the property west of the town, thereby fraudulently and knowingly violating [the contract sued on] and damaging defendant $5,000.   By reason of said location he is put to great inconvenience, and is damaged by the reduction in the market value of his property.   (5) The subscription sued on is conditional upon the railroad company issuing to him stock in the sum of $100 per share to the amount of $2,900, when the subscription is paid and at the time of its payment.   The contract sued on is for the purchase of stock, and no other consideration, except as above set forth.   On May 5, 1891, the railroad company, by proper deed, made in pursuance of a directors' meeting and stockholders' meeting, sold and conveyed to the Savannah & Western Railroad Company, a Georgia corporation, its entire line of road and all its property, including its franchises, for a valuable consideration, and said railroad company has no rightful or legal existence, and cannot now issue its stock, having sold and conveyed the same as aforesaid, and there is now in fact and in law no longer any such corporation.   (6) Since the subscription was made the railroad company has procured an amendment to its charter, materially and fraudulently altering the charter, by legislative act of September 26, 1888, authorizing it to extend its road to Atlanta, Augusta, Macon and Savannah, and to increase its capital stock to $15,000,000, to none of which changes of charter did defendant agree, having no knowledge of such change of charter until long after its procurement.   He does not agree to any of said changes, or

to any other amendment to the charter, and is released
from his subscription by reason of said radical changes of
charter.    (7) [Since] the time the subscription was made
said railroad company has procured an amendment to its
charter, materially and fraudulently altering the charter.
About March 2, 1891, it procured an amendment to the
charter, under the general law for amendments of railroad
charters, of December 29, 1890, authorizing and empower-
ing the railroad company to increase its stock to any amount
deemed proper by it, extend its line to any point in the
State it may desire, change the route thereof, make con-
tracts with other roads, sell its property and franchise to
other roads, purchase other roads, and build branch roads
from said railroad to any point.    To none of these changes
of charter did defendant agree, having no knowledge there-
of until long after their procurement, and he does not agree
thereto or to any other amendment of the charter, and he
is thereby released from said subscription.    (8) The clause
in the original subscription, containing the condition that
the main line should pass through the corporate limits of
LaFayette, was, before and at the time defendant sub-
scribed, definitely and positively understood to mean, both
by defendant and the railroad company, that the railroad
would be built on what is known as the "old railroad bed,"
west of the court-house in said town, and east of the present
line of the railroad, as built by the Chattanooga, Rome &
Columbus Railroad Company.    It was distinctly under-
stood at the time that a definite description of location of
the railroad would put defendant, and others who had
guaranteed the right of way to said road, to greater expense
than to leave the exact location indefinite, and defendant
signed the subscription with the positive understanding
and agreement that the road would be constructed on
said old railroad bed, and he would not have made the sub-
scription if he had not been so assured.    In the location of
the railroad by said town he was misled and deceived by the

railroad company. He acted on said agreement made as above stated, and was deceived in that the railroad company did not follow the old road-bed, but constructed its road, for its own benefit and to his injury, and in defiance of said original contract and agreement, several hundred yards further west from the old railroad bed and from the town, where defendant then and now resides, and then and now owns property. The railroad company fraudulently concealed its real purpose, in that it and its promoters, after leading defendant to believe that it would come through the town on the old railroad bed, and after deceiving him as to the real purpose in leaving the location in the original subscription doubtful and indefinite as above stated, adopted the other route mentioned above, to which defendant then objected. He was deceived and defrauded in that he acted upon the representation that the clause meant, and was understood to mean by both parties at the time of signing the contract, that the railroad would be constructed on the old railroad bed. The railroad company did not at the time intend to so construct the railroad, but in order to deceive and defraud defendant, left the location indefinite as above stated. He had confidence in said company, confided in said representations and was induced thereby to subscribe, by which he was defrauded. (9) The stock subscription was never legally transferred to Hillman nor to the construction company, and the transfer could not legally be made separate and apart from the conveyance of the property upon which the stock is based, and which is represented by the stock of the company. Whoever holds and seeks to enforce said subscription must be in condition to comply with the terms of the subscription, and able to issue and furnish the stock subscribed for. This Jackson cannot do, nor can the railroad. It has parted with its property and franchises and cannot now issue the stock certificates. If it could now issue the stock it would be valueless. The railroad company has parted

with all its property and rendered any stock now issued by it wholly valueless, and cannot comply with its obligation, and the railroad company is now insolvent, and cannot respond in damages to defendant for failure to comply with its contract, if he be compelled to pay the subscription. The railroad company and all its property and franchises are in the hands of a receiver, and it cannot now deliver certificates of stock to defendant, or anything else of value, in accordance with the terms of the stock subscription.

The demurrer to the pleas was general, and specially on the following grounds: As to plea (1), it seeks by the allegations relating to an old grade or a line equally near the center of the town, to engraft a parol condition upon a written contract. As to plea (4), it does not set forth clearly and distinctly wherein the alleged contract affects defendant's interests, nor that said contract was not perfectly consistent with its obligation to defendant to locate the road so that the main line would pass through the corporate limits of LaFayette; nor does it allege wherein or how the railroad company was under contract or obligation to build the road for the benefit of defendant's property. As to plea (5), the condition to issue a certificate of stock is a condition subsequent and not to be performed until full payment of the sum subscribed, and after payment defendant has his remedy against the Chattanooga, Rome & Columbus Railroad Company, and not by defense against plaintiff, who is a transferee; and defendant does not allege whether said railroad company has authority to sell its road or not. It is not alleged that defendant did not acquiesce in the sale, nor what his knowledge or conduct touching the sale was; and it appears that said sale was long subsequent to the transfer of the contract sued on, and to the time when said subscription was due, to wit, November, 1888. As to plea (6), it is not alleged that said amendment was ever accepted by the railroad company, or acted upon, nor that ten

miles of the same have ever been built, nor that defendant did not acquiesce in said amendment; and said amendment was passed after the transfer by the railroad company of the contract sued on, and cannot affect the plaintiff. As to plea (7), said amendment is not alleged to have been accepted by all the stockholders of the railroad company, nor that any act has been done by virtue of said amendment that could not have been done under its original charter; and the amendment was granted long after the transfer of the contract sued upon, and does not affect the rights of plaintiff. As to plea (8), the same ground as taken in reference to the first plea. And to plea (9), the value of the stock is immaterial.

The motion for a new trial (after verdict for defendant) was upon the general grounds; because the verdict fails to specify the plea or pleas upon which the jury found; and for errors in the court's charge to the jury, and in admitting and excluding evidence. The portions of the charge assigned as error are as follows:

"If you find that he, the defendant, was by any fraudulent representations induced to sign the subscription list, then he would not be bound by it. Fraud vitiates all contracts, and it vitiates this contract.

"If you find, on the other hand, that he signed this contract with his eyes open, with a full knowledge of the terms of the contract, and understood what it meant, and there was no fraud practiced on him at the time he signed, then parol evidence and evidence going to show what the contract was, not on its face, would not be admissible for changing or altering its terms.

"If you find that there was no fraud acting on Warthen at the time he signed the contract, but it was stated to him, and so he would understand it, and if there was no fraud in it, and the other party did not make it for the purpose of deceiving, that the road was to be located on the old grade located in the corporate limits; as I stated, if you find that

there was no such false and fraudulent statement of that sort, and Warthen signed the contract with the understanding that that was the contract, if he did not see that that contract did not express that, it would not be such a contract as to allow parol testimony to come in for the purpose of adding to or varying the terms of the contract.

"If you find that after the defendant's subscription for the stock of the railroad company, the charter of the company was, by an agreement, materially, fundamentally and radically changed without the consent of the subscriber, he is released from the subscription.

"If you find that by any such amendment the company was authorized to extend its road or branches thereof to any point or points to which they [could not] under the charter as it existed when the subscription was made, or if it could increase its capital stock beyond the amount it was limited to under the charter as it existed at the time the subscription was made, such enlarged powers would be a material, fundamental or radical change.

"Now you will find whether the Chattanooga, Rome & Columbus Railroad Company accepted the general railroad law as an amendment to its charter, since the defendant subscribed for the stock and without his consent. If the company did so accept the general law as an amendment to its charter, and if you find that the power of the company to extend its road beyond point or to other points not authorized by its charter, as it existed on the 4th of September, 1887, was given by this general law, then the subscriber is released.

"You will find in evidence an act approved 26th of December, 1888, as an amendment to its charter. You will determine by the evidence whether that amendment was accepted by the railroad company. If it was, then see whether that amendment authorized the company to extend its road to a point or points to which they could not extend it under the charter as it existed when the defendant

subscribed for the stock, and if the defendant did not consent to such amendment, then the subscriber will be released.

"On the subject of whether or not the plaintiff has placed himself, or the party in whose name he brings this suit has placed itself, in a position where he cannot comply with the terms of this contract, and deliver to the defendant, upon payment of his stock subscription, stock in the company, I read you this as applicable to that point in this case: This subscription is for shares of the stock of the railroad company. The plaintiff in this case sues for the use of James U. Jackson. The contract evidenced by the subscription of stock sued on shows two concurrent and dependent provisions, one on the part of the defendant to pay $2,900 and the other on the part of the company to furnish the stock or certificate of stock upon the payment. Neither party can require the other to perform without being able to perform his part of the contract. If the railroad company has placed it beyond its power to comply with its part of the contract, or to enable the plaintiff to comply with his part of the contract, he cannot enforce the contract. And if the railroad company has parted with all the property and franchises upon which the value of its stock depended, and voluntarily destroyed the value of the stock when issued, the railroad company, nor Jackson the usee, could compel the subscriber to pay for the stock.

"If the company's assets are in the hands of a receiver and it is out of the power of the railroad company to furnish the stock, there can be no recovery in this case."

The errors assigned as to evidence are:

In allowing B. F. Thurman to testify, over plaintiff's objection: "They said, if we would take that stock they would give us the benefit of the location of the road where-ever we wanted it, and locate the depot. In other words, we considered it buying the rights, privileges and benefits of this railroad. It originated first with Mr. Williamson.

I don't remember the dates. I think it was in the spring of 1887 that the statement was made. We were assured that the railroad would come into town on the old road-bed, by Mr. Lumpkin acting for Mr. Williamson. He told me that was the positive understanding. The reason he told me that, I objected to signing that subscription book until that was put in the subscription, and I am sorry to this day that it was not done. He said he was positively instructed by Williamson not to do that, and that he had letters in his pocket from Williamson that it was positively to be located there, and it was not to be known to these people because it would cause them to charge them too much for the road bed." This evidence was objected to, because it sought to vary a written contract with previous parol stipulations; defendant was no party to this understanding; the contract in writing was complete and unambiguous, and all previous stipulations and conversations and understandings were merged into the writing; and neither Williamson nor Lumpkin had authority, as plaintiff contends, to make any such stipulation. Further, plaintiff contends that Lumpkin's evidence shows that the letter in question was written confidentially to him upon a restricted and definite subject, viz: to enable him to obtain the right of way; and had no reference to inducing subscriptions, and in fact did not represent Williamson in getting subscriptions, but only in obtaining rights of way. And such evidence could not affect Jackson, who claimed under creditors and innocent purchasers, and was himself an innocent purchaser and holder.

In allowing the same witness to testify that Williamson "said he, Williamson, had a controlling interest in that land (lying near freight depot) over there for the control of that location and the freight depot." Objected to as irrelevant; as seeking to go behind and vary a written contract, and being the mere sayings of Williamson after the location was complete; because the location of the freight

depot was not a material issue, if the railroad ran through the corporate limits; and because such evidence could not affect plaintiff.

In allowing the same witness to testify: "They built the first depot down near the Russell place, down nearly at the line," over objection on grounds already stated.

In admitting a certified copy of an act to amend the charter of the Chattanooga, Rome & Columbus Railroad Company, so as to authorize said company to extend its railway lines to Atlanta, Augusta, Macon and Savannah and also to the Florida line; and providing that the capital stock of the company might be increased to $15,000,000, and that unless at least ten miles of the road should be actually built and equipped within five years from the passage of this act, then the privileges therein granted should lapse and become of no effect. Attached to said copy was a certificate dated February 11, 1890, that the same is a true copy of the charter of the Chattanooga, Rome & Columbus Railroad Company and of the amendments thereto, and that the officers of said company are J. D. Williamson, president, R. T. Fouché, secretary, J. H. Rhodes, cashier; signed (with the company's seal attached) by R. T. Fouché, secretary. Also an entry of filing in the office of the secretary of State, February 12, 1890; and a certificate from the secretary of State that the same was a correct copy of charter and amendments, filed by the company on 12th day of February, 1890. Objected to because, if said amendment was made and accepted, it was after said subscription was executed and transferred; because, although the amendment was allowed, it was never acted upon, there was no extension of road under it nor change of capital stock nor any other material change, and even if made and accepted, and fundamental, it could not affect the plaintiff, because he and those under whom he claimed were creditors and innocent purchasers; because a certified copy by the secretary of State of a copy certified

and filed by the company for other purposes, was not competent evidence of such amendment, and a certified copy by the secretary of State of a certificate of the secretary of the company was not competent nor best evidence of the acceptance of said amendment by the company; because there was no evidence that ten miles of the road had been built and equipped under the amendment, and therefore the amendment had lapsed and become of no effect, more than five years having elapsed; the evidence affirmatively showing that the road as originally built extended from Chattanooga to Carrollton, had never been changed or altered, nor a single additional mile constructed, and the capital stock as fixed at $2,800,000 had never been changed.

In admitting the deed from the Chattanooga, Rome & Columbus Railroad Company to the Savannah & Western Railroad Company, dated May 5, 1891, conveying all its railroad property and franchises of every sort. The objection was, that the sale was authorized by the charter and laws in force at the date of the subscription; or if not, then the sale was made under amendments contemplated by existing charter and laws, or else was illegal and void and could not avail as a defense; that it was illegal because the general law was not adopted by all the directors nor by all the stockholders, but by only two thirds of the stockholders, and the sale was only authorized by two thirds of the stockholders; and, as defendant did not consent, it was null and void as to him; that plaintiff and those under whom he holds were and are creditors of the company, and innocent holders, and could not be affected by said amendment, or sale made afterwards; and that the contract of subscription contemplated the most radical changes in the corporation.

In allowing J. C. Clements to testify: "Dr. Holmes and I went to New York in the spring of 1889, and had a conversation with Borg, Sully and Dow. Borg and Dow had large interests in the construction company. We made complaints of J. D. Williamson's management and

they said they would come to Georgia and investigate. They came by LaFayette on the train, and I pointed out the objectionable location; and between LaFayette and Rock Springs, in conversation with Mr. Dow, he said that he thought he could say that this matter could be arranged to the satisfaction of the people here, and the location could be made satisfactory to them, if they would pay their subscriptions. We told him that it was useless to insist on these subscriptions, for nobody would pay them under the circumstances." Objected to as irrelevant and immaterial; as sayings and admissions of parties without authority, and, if with authority, long after the road was constructed; as seeking to vary a written instrument by parol; and as mere conversations looking to a compromise.

In allowing the same witness to testify, that his recollection was that Borg, Sully and Dow were acting as directors of the Chattanooga, Rome & Columbus Railroad Company. Objected to because the minutes of the company were the best evidence, and were introduced by defendant, and none of their names appear on the record as directors; because the minutes showed that other parties were the directors; and because witness was the president of the company, and testified that these parties were never in a meeting acting as directors with him. He stated that he drew his impression that they were directors from the conversations with J. D. Williamson and from his management of the road.

In allowing H. P. Lumpkin to testify: "I received a letter from Williamson while I was at Dade superior court; I don't know whether it was before the subscription contract was signed or after. It said, 'Railroad located from Rock Springs into the town of LaFayette on old grade. Get right of way as soon as possible.' I have lost this letter and can't find it." Objected to, as an attempt to vary the terms of a written contract; as a mere statement made to an employee, not meant to influence subscribers if made before, and, if after, was immaterial; and as confidential,

the witness not being competent to testify. He stated that he was in Williamson's employ to get right of way; supposed Williamson employed him because he (witness) was an attorney at law, but did not know; and that this letter contained information that was to be kept secret from the public until the right of way was obtained, and was secret except to those on the inside.

In refusing to allow W. W. Brookes (who had testified that he was secretary of the Chattanooga, Rome & Columbus Railroad Company, and that there had been set aside and was held for the benefit of the subscribers of the stock $235,400 of the capital stock of the company, $100,000 of it for the Chattanooga subscription and the remainder for subscribers along the line) to testify that his clients stand ready to deliver this stock whenever the subscriber pays his subscription.

In allowing defendant to testify: "It was the understanding at that time (when I signed subscription) that it (the railroad) would come in on the old grade. I think I got this understanding from Mr. Williamson himself, from parties that were with him at the time the conversation was going on. I would not have signed unless it was understood to go through the town and satisfactory to the subscribers." Objected to because it varied the written contract by parol; and because it was vague, indefinite and unauthorized.

*W. W. Brookes* and *W. T. Turnbull*, for plaintiff.

*R. M. W. Glenn* and *McCutchen & Shumate*, for defendant.

SIMMONS, Chief Justice.

The Rome and Carrollton Railroad Company obtained an amendment to its charter in 1886, authorizing it to extend its line from the city of Rome in a northerly direction through the counties of Floyd, Chattooga and Walker to any point on the line dividing the States of Georgia and

Tennessee, in Walker or Catoosa county. Two routes were in contemplation, one of which ran through the town of LaFayette, the county site of Walker county, and the other through another part of the same county; and the citizens of LaFayette, in order to induce the railroad company to select the route running through their town, held a meeting and appointed committees to obtain subscriptions to the stock of the company. Sufficient subscriptions were obtained to induce the company to select that route. The paper signed by the subscribers was as follows:

"The undersigned hereby subscribe for the number of shares of the capital stock of the Chattanooga, Rome & Columbus Railroad Company set opposite our respective names, said shares being of the par value of one hundred dollars each; and on the 15th day of November, after the cars commence running from a point at or near the city of Rome, Ga., through the counties of Floyd, Chattooga and Walker, in Georgia, to the city of Chattanooga, Tennessee, over a road built by said company, we promise to pay to said company, its associates, successors or assigns, 25 per cent. of our subscription in cash, and will at the same time give our several individual promissory notes for the remaining 75 per cent., one third of which shall become due every six months after said 15th day of November; said notes not to bear interest until maturity, but from and after maturity to bear interest at the rate of six per cent. per annum until paid.

"And when any subscription is fully paid, the subscriber shall then be entitled to a certificate of stock in said company, upon the basis of the capital stock of the company as then fixed and existing at the time of said full payment.

"Provided, however, that each subscription hereto shall be null and void and of no force or effect whatever unless the main line of said railroad, when built, shall pass through the corporate limits of the town of LaFayette, Georgia; and provided further, that these subscriptions are in lieu of all other subscriptions heretofore made by us to the stock of said company."

N. G. Warthen was one of the subscribers. In June, 1888, the railroad was completed from Rome to Chatta-

nooga, Tennessee, and cars were run thereon on regular schedules. The road was built by a construction company, under a contract with the railroad company, and the latter assigned to the construction company a certain amount of its bonds and stock and the subscriptions already obtained, and those that were to be obtained. Warthen's subscription was of the latter class. His subscription was regularly transferred and assigned, and finally by assignment came into the hands of Jackson, in June, 1892. Jackson made a demand upon Warthen for the payment of his subscription, which was refused; whereupon, the Chattanooga, Rome & Columbus Railroad Company, for the use of Jackson, commenced suit against Warthen. To this action the defendant filed several special pleas, which will be found in the report. On the trial of the case the jury rendered a verdict for the defendant, and the plaintiff made a motion for a new trial, which was overruled, and it excepted.

1. We will say at the outset, that the paper sued on, although assignable, is not such a negotiable instrument as would protect the holder from equities or defenses that the maker thereof might have against the original holder. It is simply a contract assigned by the railroad company to the construction company. Our code (§2244) provides that "all choses in action arising upon contract may be assigned so as to vest the title in the assignee, but he takes it, except negotiable securities, subject to the equities existing between the assignor and debtor at the time of the assignment, and until notice of the assignment is given to the person liable." The paper sued on being one to which the maker can set up any defense, as against the assignee, that he could have set up against the original holder, we will deal with the case as if the original holder were the plaintiff.

2. The paper sued on provides that the subscription shall be null and void "unless the main line of the said railroad, when built, shall pass through the corporate limits

of the town of LaFayette." In one of his pleas the defendant set up that the railroad did not pass through the corporate limits of the town of LaFayette, and that under this proviso in the contract, the subscription was null and void; also, that it was understood and agreed between the railroad company and the defendant that the railroad should be built upon the grade of an old railroad which passed near the center of the town, or upon a line equally near the center; but that the road was constructed outside the corporate limits, or if within the limits, upon the very edge thereof, and this was only a colorable compliance with the conditions and was fraudulent and in violation of the terms of the agreement and subscription, and this fraudulent conduct released the defendant. This plea was demurred to and the demurrer was overruled, and to this ruling the plaintiff excepted.

Under the contract of subscription, we think the railroad company had a right to run its track anywhere within the corporate limits. The contract did not specify any particular line or route through the town. Nor did it provide how far it should run from the corporate limits. It simply provided that it should run through the corporate limits. If that was done, it was a sufficient compliance with the contract so far as the location of its route was concerned.

3. This contract could not be varied, or new terms added to it, as the defendant sought to do, by proof of conversations with officers or agents of the company, showing an understanding with him that the road was to be built on a particular route within the corporate limits. If at the time of making his subscription he desired that the road should be built upon the old grade, he ought to have had a stipulation to that effect embodied in the writing. If he had done this and the railroad company had failed to comply with the stipulation, such failure would have constituted a good ground of defense. But having signed a contract which contained no such stipulation, and which

was unambiguous, he could not show by parol evidence that the agreement was that the road should be built upon the old grade, without pleading that the agreement to that effect was omitted from the writing by fraud, accident or mistake; (see *Bell* v. *A. P. & L. Railroad Co.*, 76 *Ga.* 755; *Weston* v. *Ry. Co.*, 90 *Ga.* 289;) and it is not pretended that any part of the contract was thus omitted.

4. Mere statements or promises by the company's officers or agents, made before the contract of subscription was signed, to the effect that the railroad would be built upon a certain line, and a failure to so build it after the contract was executed, would not constitute a fraud upon the subscriber or afford him any ground for avoiding payment, there being no contention that anything was omitted from the writing which was intended to be inserted therein. In this case there was no evidence of any fraud whatever; and it was error for the court to charge the jury upon the hypothesis that there was. Mr. Lumpkin, an attorney at law in the employment of Williamson, the president of the construction company, was allowed to testify, over objection, that he received a letter from Williamson in which it was stated that the railroad would be laid upon the old grade; but he could not say whether this letter was dated before or after the defendant's subscription was made. Of course if it was made subsequently, it would not amount to anything; if made before, it is very doubtful whether declarations of the president of the construction company as to where the road would be located would bind the railroad company. Even if admissible, it does not appear that the defendant knew of the statement before he signed the contract, for Mr. Lumpkin testified that he spoke of this letter only to those who were, as he expressed it, "on the inside." He kept it a secret because he was the agent of Williamson to secure the right of way and because he feared that if he mentioned it before the right of way was secured the landowners would charge large prices for the right of way

through their land. The defendant himself does not testify to any positive promise or statement of any officer or agent of the railroad, that the track would be laid upon the old grade. In his testimony he says: "I think I got that understanding from Mr. Williamson himself, and from parties that were with him at the time the conversation was going on"; but there is nothing in his evidence more definite than this. Thurman, one of the defendant's witnesses, who was also a subscriber to the stock of the company, testified that he insisted that this stipulation as to the location of the railroad upon the old grade should be inserted in the contract, but that Lumpkin refused to insert it, saying that he was positively instructed not to put it in.

5, 6. Another defense set up by the defendant was, that he subscribed to the stock of the Chattanooga, Rome & Columbus Railroad Company, and that it had sold out its franchises, railroad and other property to another railroad company, and the purchaser could not issue him the stock subscribed for, and for that reason he should not be compelled to pay his subscription. The charter of the Chattanooga, Rome & Columbus Railroad Company authorized it to sell its property and franchises to any other company; and the exercise of this power would not affect the subscription. See Thompson, Commentaries on Corporations, §1291. If the plaintiff company had made a valid and legal sale of its franchises and property to another company, the defendant, under his contract, could have insisted on receiving the stock from the purchasing company when he paid the subscription. It appears, however, from the record, that the sale was set aside by a court of competent jurisdiction, and that the plaintiff company was at the time of the trial still in existence. It is true the company was in the hands of the court, through its receiver, but that did not destroy the corporation. It still lived, and on the payment of the subscription it had the power and right to issue its stock to any subscriber who was entitled thereto. Ad-

mitting for the sake of the argument that this plea had merit in it when it was filed, it had no merit in it at the trial, and it was competent for the plaintiff company to prove that the stock was ready for delivery and would be delivered on payment of the subscription. That it had no value was immaterial.

7. The subscription contract was signed in September, 1887. In 1888 the legislature amended the charter of the plaintiff company, thereby making material and fundamental changes. Among other things, it was provided in the amendment that "unless ten miles of road authorized by this act shall be actually built and equipped within five years from the passage of this act, then the privileges herein granted shall lapse and become of no effect." (Acts 1888, p. 171, sec. 5.) There is no evidence in the record showing that this amendment was ever accepted by the company or its stockholders. At the time of the trial, which was more than five years after the act was passed, no part of the ten miles had been actually built and equipped, and the amendment had therefore lapsed and become of no effect. The defendant set up in one of his pleas that the amendment was made without his consent, and that it effected a fundamental change in the charter, and he was therefore released from his subscription. The court charged that if the change was fundamental and made without his consent, he was released.

Upon the facts above recited, we think the charge was erroneous. It will be observed that the amendment is not mandatory, but merely permissive. It authorizes and empowers the plaintiff company to build new roads and to increase its capital stock, but it does not require it to do so. Whatever may be the law as to the necessity of a company or its stockholders accepting a mandatory amendment made by the legislature in the interest of the public, it is well settled that a mere permissive amendment to a charter must be accepted by the stockholders of the company. See gen-

erally on this subject: 1 Beach, Corp. §36 *et seq.*; 1 Thomp. Com. Corp. §52 *et seq.*; 4 *Id.* §5380 *et seq.*; 11 Am. Law Reg. N. S. 1.    And see *Snook* v. *Ga. Imp. Co.*, 83 *Ga.* 65, 66, and cases cited.

The stockholders of the plaintiff company never having accepted the amendment to its charter, nor acted under it, the amendment, although authorized by the legislature, would not release the defendant from his subscription. Not having been accepted, it did not become a part of the charter, and he cannot complain.    1 Beach, Corp. §42, p. 80, note 1; Delaware, etc. Co. *v.* Irick, 23 N. J. L. 321.

8. The charter of the plaintiff company, at the time the defendant made his subscription, authorized it to increase its capital stock to ten millions of dollars, to issue income bonds and pledge its property and franchises and pledge the income to redeem them.    It also had power to extend its line from Rome, Georgia, to the State of Tennessee, and consolidate with any other railroad authorized to be built by any State in the United States, to build a line of railroad from Cedartown in Polk county to Columbus in Muscogee county, and to build a branch railroad from any point on its line to Montgomery, Alabama, with the privilege of connecting with any other railroad in the State of Alabama, and to build such other branch roads as it might see fit from its main line to any places or points not exceeding twenty miles distant therefrom; it also had authority to purchase or lease any other railroad chartered by the laws of any other State in the Union, and to sell or lease its railroad franchises and property to any other railroad company, and also to consolidate its railroad with the railroad of any other company.    In 1890 the legislature passed a general law for the uniform amendment of special charters of railroad companies which had been granted or might thereafter be granted, and provided that a railroad company which had been chartered might apply to the secretary of State and have incorporated into its charter a

portion of the general railroad law of the State from section 1689(i) to section 1689(gg) of the code, inclusive, and the acts amendatory thereof. Under this act, the plaintiff company had these different sections of the code included in its charter. The defendant insisted that this was a material and fundamental change in the charter, and that as it was made after he became a stockholder or subscriber, he was thereby released from his subscription.

We have carefully read the sections of the code which were incorporated into the charter by this amendment, and they do not differ materially from the charter as it stood before they were incorporated therein. They do not enlarge the undertaking so far as to entail new responsibilities or new hazards upon the company. They merely enlarge the powers or privileges of the company, without materially changing its original purpose; nor do they authorize a material departure from its original design. See Thomp. Com. Corp. §1278. The charter before it was amended gave the company substantially the same powers as to extension of its road that section 1689(j) of the code gives. Nor would the latter part of section 1689(m) authorize the railroad company to remove its track from the town of La-Fayette. That part of the section means that after the track has been laid within the corporate limits of a town or city, it shall not be changed within the corporate limits without the sanction of the mayor and council or other governing body of the town or city.

9. In so far as the trial judge in his rulings upon demurrers to pleas, in admitting or rejecting evidence, or in charging the jury, failed to conform to what is above announced, error was committed. The next trial should be had in accord with what is here laid down as the law applicable to this case.    *Judgment reversed.*