18550. DEARISO *v.* MOBLEY, superintendent of banks, *et al.*

314

DECIDED JUNE 16, 1928.

*Perry & Tipton,* for plaintiff in error.

*O. A. Park, C. N. Davie, C. S. Reid, Passmore, Forehand & Ford,* contra.

BELL, J. On July 15, 1926, T. R. Bennett, superintendent of banks, took possession of the Farmers & Merchants Bank of Sylvester, Georgia, for liquidation under the banking act of August 16, 1919 (Ga. L. 1919, p. 135). On October 7, 1926, an execution was issued by the superintendent, by W. J. Davis, general agent, against Mrs. Mollie Deariso, one of the stockholders, for the purpose of enforcing her statutory liability as such, in pursuance of an assessment made against the stockholders for the benefit of the depositors. To a levy of this execution upon her property Mrs. Deariso filed an affidavit of illegality, and, the issues formed thereby having been submitted for trial in the superior court upon an agreed statement of facts, before the presiding judge without a jury, and the trial having resulted in favor of the plaintiff in fi. fa., Mrs.

Deariso, the defendant in fi. fa., excepted. Some time after the execution was issued, Mr. Bennett resigned as superintendent of Banks and was succeeded by A. B. Mobley, who has since prosecuted the case as plaintiff in fi. fa. and is made a defendant in error in the bill of exceptions. The execution was issued upon the theory that Mrs. Deariso was the owner of six shares of stock, and proceeded for a recovery of $600, the full amount which could be assessed against the holder of that number of shares. In one ground of the affidavit of illegality Mrs. Deariso pleaded that at the time the bank failed she was the owner of only three shares of stock, and thus in no event could be held responsible for more than $300 on her statutory liability as a stockholder. Another ground of the affidavit raised the questions whether the superintendent may confer authority upon an agent to issue such an execution; and, if so, whether the appointment under which the agent purported to act in the particular instance was effectual for that purpose, and also whether the execution was in proper form as to the manner· in which it was signed and issued. It will be observed that we have four questions for decision, and the facts in relation to each question will be noted in the opinion.

The first question is whether Mrs. Deariso owned six shares of stock or only three shares at the time the bank failed on July 15, 1926. The bank's original capital stock was $25,000. By a first amendment to its charter, this amount was increased to $50,-000. Only $17,000 of the additional stock, however, was actually paid in, and on January 13, 1926, the bank was operating on a paid-in capital of $42,000. At a meeting of the stockholders held on that date a resolution was adopted reciting the fact that the capital stock had become impaired more than 10 per cent., and that it was necessary to assess the various stockholders in an amount sufficient to raise the value of the stock to par. This resolution provided that the assessment upon the stock should be made by diminishing the holdings of each shareholder by 50 per cent., each shareholder to surrender the certificates representing the stock then owned by him, and to receive new certificates in one half the amount. By this plan, the then outstanding capital stock would be reduced from $42,000 to $21,000. The resolution proposed also an application for a second amendment to the charter, reducing the capital stock to $25,000, and provided for the sale of 40 shares of

new stock at the par value of $100 per share, "to bring the new capital up to $25,000." An application for the amendment was duly filed with the secretary of State, and, after it was referred by that officer to the superintendent of banks, who certified his approval in terms of the statute, the application was granted by the secretary of State on May 12, 1926, as evidenced by his certificate to the effect that the "State of Georgia hereby amends the charter of the said 'Farmers & Merchants Bank' by changing its capital stock from fifty thousand ($50,000) dollars to twenty-five thousand ($25,000) dollars." It is only with this, the second amendment, that we are concerned in this case.

The copy of the application was advertised once a week for four weeks prior to its filing, as required by law. Before this publication had been completed, and thus before the application for the amendment had been acted upon and granted by the secretary of State, all the stockholders surrendered their certificates to the cashier, in pursuance of the resolution of the stockholders adopted on January 13, 1926, and in the expectation that new stock would be issued to them in the amount of 50 per cent. of that surrendered as provided by the resolution. And, to quote from the agreed statement, "before receiving the certificate of amendment the officers of said bank had obtained an agreement with parties to sell them the 40 shares of new stock in said bank at the par value of $100 per share; and checks were issued to said bank by certain of said parties agreeing to buy same, aggregating $3900, and were delivered to said bank with the understanding with these subscribers that when checks had been obtained for the full amount of $4000 that all of said checks be cashed and certificates of stock be issued to each purchaser of said stock according to his subscription. The one share of $100 shortage in the $4000 of the checks is explained as follows: G. L. Warren, the cashier of this bank at the time, who handled the matter of selling this stock, agreed to take and pay for this share, but accepted a position at Waycross and moved there a month before the bank closed, and never put up his check or paid his subscription. At the time the bank closed, the checks, aggregating $3900 on this stock, were in hand by said bank. Said checks were never cashed by said bank or in any way used by it as an asset. No new certificates of stock were ever issued in consideration of said checks. At the time the bank closed, all of said checks were

good except two or three, in which cases the parties placing these checks did not have deposits sufficient to pay their checks. In one or two instances these subscribers had made notes to said bank and these notes had been discounted and placed to their credit in order to make their checks for said stock good. The old certificates of stock that had been surrendered for the purposes of the proposed reduction were never cancelled, and no new certificates of stock were ever issued in lieu of them, but, on the contrary, said bank continued its business under these conditions for about forty days and until it was forced to close its doors on the 15th of July, 1926. Business was continued in the same manner, the general ledger showing of the capital stock $42,000 outstanding, as it had done ever since the amendment to charter increasing the capital stock from $25,000 to $50,000 and this sale of $17,000 of this increase. There was never any meeting of the stockholders after said amendment to charter of date May 12th, 1926, was granted, the meeting held by said stockholders on January 13, 1926, being the last meeting held by them before the bank closed on July 15, 1926."

The six shares of stock owned by Mrs. Deariso were evidenced by certificate number 218, and this, like the certificates of all the other stockholders, was surrendered to the officers of the bank in accordance with the resolution of January 13, 1926, and remained of file with the cashier until the bank was closed on July 15 following. Her name continued upon the books as one of the stockholders, and there was no entry of any sort purporting to cancel her stock or the certificate thereof, nor was any new certificate ever issued to her as was contemplated by the resolution referred to.

In discussing the matter of the number of shares owned by Mrs. Deariso at the time the bank failed, that is, of whether the plan for the reduction of the amount of stock owned by each of the shareholders had become effective, the counsel have given considerable attention in their briefs to the question of whether the amendment to the charter, as granted by the secretary of State on May 12, 1926, had become operative. It is contended by counsel for the plaintiff in error that in view of what had been done previously, the number of shares owned by each of the stockholders was cut in half instantly on the granting of this amendment, and that no acceptance of the amendment by the stockholders or the corporation

was necessary for the accomplishment of that end. On the other hand, it is insisted by counsel for the defendant in error that the amendment to the charter did not become effective in the absence of acceptance, either express or implied, on the part of the corporation or its stockholders, after the order allowing the amendment had been promulgated.

It seems to be the general rule that in order for a material amendment to the charter of a corporation to become effective, it must be accepted formally by the stockholders, or else must be acted upon by the doing of the things which it contemplates or the transaction of business thereunder. *Chattanooga &c. R. Co.* v. *Warthen,* 98 *Ga.* 599 (7) (25 S. E. 988) ; 14 C. J. 184. But irrespective of what may ordinarily be necessary to put into effect an amendment to the charter of a bank, we think, in the particular case, that it was never contemplated that the amendment should become effective until the bank was recapitalized in the sum of $25,000. It may be true that, in view of the fact that all of the old stock had been surrendered with the intention on the part of the individual stockholders and of the bank that new stock would be issued in half the amounts, the issuance of certificates for the new stock might not have been necessary in effectuating the change in the amount to be owned by each shareholder; but, from all the facts appearing, construed in the light of the law, we are of the opinion that until some person or persons became the owners· of the full amount of the new stock to be issued, the original status was not altered. All that was done toward procuring an amendment to the charter preceded the certificate issued by the secretary of State; nothing whatsoever was done afterwards. The bank continued to operate as upon a capital of $42,000, and never at any time acted upon the subscriptions for the new stock. Unless ownership of the new stock by some person or persons other than the bank had become effectuated, the amount of the stock of Mrs. Deariso and of others in like situation could not have been diminished as contended without reducing the entire capital stock to an amount materially less than that prescribed in the amendment and below the minimum required by law for such an institution. We are therefore of the opinion that the principal question for determination is whether the proposed new stock had been disposed of in such manner that the subscribers became stockholders, and were thus subject to assessment on the basis of such

stock for the benefit of depositors as contemplated by law. While it may not have been necessary that certificates of stock should have been issued to such subscribers, a mere offer to purchase stock, as by an unaccepted subscription, is not enough to create the relation of stockholder. A person ordinarily becomes a stockholder by means of a contract between himself and the corporation, and an offer to subscribe for or purchase stock must be accepted expressly or impliedly by the corporation, and the fact of such acceptance must be communicated to the other party or manifested by some act equivalent to communication or notice thereof. The mutual assent of the parties is a requisite to the establishment of legal relations, just as in other contracts; and where in special instances conditions precedent exist, they must be complied with. .14 C. J. 515, 838.

Checks are not payment until they themselves are paid, and no acceptance of the subscriptions or of the checks appears to have been made in this case. By the very terms of the subscriptions here involved, there could be no effective acceptance "until checks had been obtained for the full amount of $4000." This provision was a condition precedent in the subscriptions and was never complied with, the aggregate of all checks posted amounting to only $3900. So we think there were never, in fact, any effective contracts for the purchase of the new stock. Furthermore, it is our opinion that the particular charter amendment contemplated that the new stock should not only be *contracted* for, but actually paid for, before the old stock could be considered as having been reduced.

We advance two propositions: (1) that the sale of the new stock for cash was a condition precedent to the reduction of the old stock; and (2) that no such sale was ever consummated. In the further discussion we will examine certain provisions of the banking act which we deem to be relevant in the support of each of these conclusions. A capital stock of $25,000 was not only exacted by the amendment to the charter, but the banking act, in article 8, section 1, subsection 3 (Ga. L. 1919, p. 164), requires a capital not less than this amount for any bank organized in a city, town, or village of a population of more than 1,000, according to the last preceding Federal census; and for the purposes of this case this court will take judicial cognizance of the fact that the city of Sylvester, by the census of 1920, had a population of more than 1,000. *Fidelity &*

*Deposit Co.* v. *Smith,* 35 *Ga. App.* 744 (134 S. E. 801) ; 23 C. J. 161. We further know, without proof, that the original charter of the Farmers & Merchants Bank was granted on August 19, 1911, and fixed the capital stock at $25,000. *Sheppard* v. *Ga. Ry. & Power Co.,* 31 *Ga. App.* 653 (121 S. E. 868). This was the minimum capital permitted by law at that time. Civil Code (1910), § 2269. In any view, it would have been unlawful for this bank ever to have operated on a lesser amount of subscribed capital. While the superintendent of banks issued his approval of the amendment to the charter in question, he must have done so on condition that the law in regard thereto was or would be complied with. This condition was necessarily implied, in view of section 5 of article 9 of the act referred to. That section provides, among other things, that whenever an application for amendment to the charter of a bank shall have been referred to the superintendent (as required by section 4), he shall by investigation satisfy himself that the amendment is proper and has been duly authorized by corporate action, "and in case said application is for the increase of the capital stock, that the amount of such additional capital has been paid in, in cash, except where surplus is capitalized, and in case said application is for the reduction of the capital stock, that the method by which such reduction is accomplished is proper and fair to all the stockholders, and that the capital stock is not reduced below the amount required by law for such bank, and that all the requirements of law have been fulfilled." If the superintendent is satisfied as to all matters as to which he is required to make investigation, he shall within thirty days issue a certificate approving the amendment and transmit a copy of such certificate to the secretary of State, who shall enter the same of record in his office. The superintendent's approval and the amendment itself must both be construed in the light of the provisions above referred to, and when so construed they can not be taken as permitting the reduction of the capital stock to a sum less than $25,000.

The amendment must also be construed in view of the application, the basis of which was the resolution of the stockholders of January 13, 1926. If there were no enforceable contracts for the sale of the new stock, it would be unnecessary to determine whether the resolution contemplated that the same should be paid for in cash as a condition precedent to the effectuation of such amendment

and the reduction of the old stock. But even assuming the existence of valid and binding contracts with regard to the new stock as between the subscribers and the corporation, this, in our view, would not have been sufficient to alter the status as between the corporation and the old stockholders. Payment for the new stock in cash seems to have been contemplated by everybody. The resolution hereinbefore so often referred to mentioned no other terms. The subscribers themselves, except one, posted checks for the amount of their subscriptions, even though some of the checks were not good at the time. The general rule is that where in a sale of property there is no agreement or custom concerning the time of payment, the presumption is that the price is to be paid on delivery. *McCarthy* v. *Nixon Grocery Co.,* 126 *Ga.* 762 (56 S. E. 72). Under section 7 of article 8 of the banking act, a bank may be authorized to commence business upon the payment of only 60 per cent. per share of the capital stock, but the remainder of the capital stock "shall be paid in within one year, in such installments as may be approved by the superintendent of banks, and the payment of each installment shall be certified to the superintendent of banks under oath by the president or cashier of the bank;" and sections 5 and 9 of article 9 clearly require that in all instances of the issuance of new stock upon any terms other than cash, the conditions of payment must be made known to the superintendent and have his approval. Under section 2 of article 9, a certified abstract from the minutes of the stockholders must accompany the application for the amendment. In none of the proceedings filed was there any statement or suggestion as to the sale of the stock except for cash, and the superintendent was not called upon to approve or disapprove any arrangement for installment or deferred payments. We thus conclude that it was one of the conditions of the amendment that the new stock should be actually paid for in cash before the amendment would become effective, and that in the meantime the old stock was not reduced. See *Fulgam* v. *Macon & Brunswick R. Co.,* 44 *Ga.* 597; 7 C. J. 494. As to the amount for which the execution was issued, the execution proceeded properly upon the theory that Mrs. Deariso was the owner of six shares; and the ground of the affidavit in which she alleged that she was the owner of only three shares was without merit.

We come next to the question of whether the execution could

be issued only by the superintendent of banks, that is, of whether this officer could delegate his authority to issue the execution by the appointment of some other person as agent to do so. The superintendent may be regarded as the State's agent to execute the banking laws, and those whom he shall designate to serve for different purposes as agents under him may be classed as subagents. No agent may delegate his authority unless he is specially empowered to do so (Civil Code (1910), § 3571), and, for reasons that are entirely obvious, this rule is usually given a very strict, if not a literal, application · in case of public officers. "The discretionary powers conferred upon public agents are in the nature of a trust and unless authorized so to do the persons chosen can not delegate them." 1 Am. & Eng. Enc. Law (2d ed.) 974. It has been said that even the ministerial duties of a public officer may not be discharged by another where they are expressly required by law to be performed by the officer in question. *Tietjen* v. *Merchants Nat. Bank,* 117 *Ga.* 501 (2) (43 S. E. 730). Even a subpœna commanding the presence of a person in court as a witness must be signed by the clerk.or his deputy, in order to be legal. *Horton* v. *State,* 112 *Ga.* 27 (37 S. E. 100). As to the power of the clerk to delegate certain other duties, the Supreme Court, in *Williams* v. *Batten,* 156 *Ga.* 620 (119 S. E. 709), said: "The provisions of the Civil Code (1910), § 5557, with reference to service upon nonresidents, by publication, being in derogation of the common law, must be strictly and literally construed. The requirement of that section that the notice therein referred to shall be mailed by the clerk does not permit the delegation of that duty to any person other than a lawful deputy clerk; and from failure of the clerk or deputy clerk to personally perform this duty failure of service by publication results. Such service is void; and where there is no service there can be no valid judgment or decree."

The proper discharge of the duties of the office of superintendent of banks requires ripe experience and extraordinary skill and judgment in the business of banking, and the law creating the office necessarily contemplates that any one appointed to this high position should be possessed of these qualifications. Considering the responsible duties which are placed by the law upon this officer, and the capacity and wisdom requisite in a person holding such position, we think there is great reason in the present case for adhering

rigidly to the general rule that an agent may not delegate his authority unless he is specially empowered by his principal (here the State) to do so, and thus for construing strictly any statutory provisions permitting such delegation. And yet it is entirely permissible for any principal to allow his agent to appoint other agents, and to grant to them such authority as the principal may prescribe. So, in the absence of constitutional limitation, the legislature, as the law-making power of the State, may confer upon the superintendent of banks whatever authority that body may deem to be proper, including the power to delegate such authority to other persons. The rule that the power of an agent or of a public officer can not be delegated seems to be everywhere subject to the exception that it may be delegated on express authority from the principal. Both in the decided cases and in the text-books the statement of the rule usually carries with it a statement of the exception. To determine, therefore, whether the superintendent of banks may appoint an agent with authority to issue executions like the one in question, it is necessary to consider the statutes having reference to the functions and powers of this officer. Section 10 of article 2 of the banking act provides that he may appoint an assistant superintendent, who shall take the same oath as the superintendent and shall give bond in a named sum, with the same conditions as those prescribed for the bond of the superintendent. But in the present case we are not concerned with any question of the power of an assistant superintendent. The appointment which we have under consideration was the appointment, not of an assistant superintendent, but of an agent. As will be shown later, it purports upon its face to have been made under sections 9 and 10 of article 7, neither of which contains any reference to an assistant superintendent. In the first mentioned of these sections it is provided: "The superintendent may, under his hand and official seal, appoint an agent to assist him in taking possession of, liquidating and distributing the assets of any bank under the provisions hereof, the certificate of appointment to be filed in the office of the superintendent, and a certified copy thereof delivered to such agent. Such agent shall receive a salary, to be fixed as hereinafter provided, for the time he is actually engaged in assisting in liquidating the affairs of the bank. The superintendent may authorize such agent to perform such duties connected with such liquidation and distri-

bution as the superintendent himself could in person do and perform." It is thus expressly provided that whatever may be done in the liquidation and distribution of the assets of a bank by the superintendent may be done by an agent duly and properly appointed by him, where he deems it proper to confer, and does confer, such extensive powers upon another.

"Liquidation," in its general sense, means the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit or loss. 5 Words & Phrases, 4180; 3 Words & Phrases (2d. series), 153. The word is used in a very comprehensive sense in the banking act of this State, as a reading of that statute will readily demonstrate. Section 7 of article 7 is in part as follows.: "Upon taking possession of the assets and business of any bank, the superintendent is authorized to collect all moneys due to such bank, and to do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof, as hereinafter provided." "Assets" would ordinarily mean the property owned by the bank as a corporate entity, and would not include the statutory liability of stockholders (Runner v. Dwiggens, 147 Ind. 238, 46 N. E. 580, 36 L. R. A. 645; Minn. Mfg. Co. v. Langdon, 44 Minn. 37, 46 N. W. 310); and while the word appears to have been used with this meaning in several places in the banking act, it is nevertheless given a larger signification in section 7 of article 18, for it is there provided that the individual liability of stockholders shall be an asset of the bank to be enforced only by and through the superintendent.

There was a similar provision in a prior statute (Ga. L. 1894, p. 76; Civil Code (1910), § 2249), with reference to which the Supreme Court, in the case of *Moore* v. *Ripley,* 106 *Ga.* 556 (2) (32 S. E. 647), said: "Further, by the act of 1894 (Civil Code, § 1890), which is above cited, this liability of stockholders is placed among the assets of the insolvent corporation, and it is declared that the receiver is the proper person to sue and enforce the liability, thus making that officer the statutory plaintiff. We know of no reason why there should be any other defendant than those liable under the provisions of the statute. The receiver represents all the parties at interest; he represents the bank as well as all the creditors." See also *Wheatley* v. *Glover,* 125 *Ga.* 710 (13) (54 S.

E. 626). "When the superintendent of banks takes possession of an insolvent bank for the purpose of liquidating its affairs, he acts in the capacity of a statutory receiver. *Carey* v. *Giles,* 9 *Ga.* 253; *Bennett* v. *Wheatley,* 154 *Ga.* 591 (115 S. E. 83)." *Bennett* v. *Green,* 156 *Ga.* 572 (3) (119 S. E. 620). The enforcement of the statutory liability of stockholders by assessment and execution is one of the duties enjoined upon the superintendent where the other assets are insufficient to pay the depositors in full. See article 7, section 20.

If the assets must be taken to include the liability of the stockholders, and if the issuing of executions for the enforcement of such liability, where necessary, and the payment of the resulting fund to depositors, are a part of the liquidation and distribution of the assets of the bank, and if, as expressly provided in the banking act, the superintendent may authorize an agent "to perform such duties connected with such liquidation and distribution as the superintendent himself could in person do and perform," it seems to follow, as a necessary conclusion, that he may empower such agent to issue the executions. Whether he might also confer authority upon an agent to make the assessment against the stockholders on the basis of their stock is a question not made in this case and that question is not decided. See in re Giles, 21 Fed. (2d) 536. Among other powers conferred upon the superintendent is the authority to bring suit, and this is in addition to his duty in regard to the issuing of executions against the stockholders. See article 7, section 7 of the banking act, and also Ga. L. 1922, p. 65. It could hardly be doubted by any one that the "getting in" of the assets, including the making of collections on any liability, would be a matter which the superintendent could entrust to an agent. In fact, when we consider what may be the multitude of his duties, the necessity of acting through others in such matters would appear to be absolute. A general authority to collect will, in the absence of an agreement to the contrary, usually include the power to bring suit to enforce payment, provided the agent may resort to only the ordinary and legitimate processes for that purpose. *Strong* v. *West,* 110 *Ga.* 382 (35 S. E. 693); 2 C. J. 633. The execution which was issued in this case was only a mode of suit, and by the special provisions of the banking act is made the usual and common method, if not the only method, of proceeding against stockholders where they fail to

respond to the notice of assessment. *Bennett* v. *Wheatley,* 154 *Ga.* 591 (3), 604 (115 S. E. 83). Where there has been assessment and notice and refusal or neglect to pay, an execution *must issue.* How then can it be of such great importance to the stockholder as to who shall issue it? Of course, it can be issued only by one legally authorized, but the point is, there are other things which would seem to involve larger responsibility, the doing of which the superintendent could unquestionably entrust to another. We believe the main mental difficulty in assenting to the legality of an execution issued by an agent is the novelty of it; but its novelty is, of course, not a reason for condemning it if the law has provided for it. It is our opinion that the superintendent may confer upon an agent authority to issue such an execution.

■ The question next arises, was the appointment under which Mr. Davis purported to act in issuing the particular execution effectual as empowering him to issue it? The power of attorney or commission under which he acted and the only authority claimed for him was as follows: "Georgia, Fulton County: Under and by virtue of the power and authority granted in sections 9 and 10 of article seven of the banking act, and amendments thereto, originally approved August 16, 1919, I hereby appoint W. J. Davis, General Agent to supervise the liquidation of all banks now or which hereafter may be placed in liquidation, and to make distribution of their assets as is provided by law, and until and unless this power and appointment be revoked. He is authorized to do and perform such duties in connection therewith as I may and could in person do or perform. This power shall specifically include and bestow upon the said W. J. Davis right to execute and deliver in the name of any bank in liquidation any and all conveyances, bills of sale, transfers or assignments of real and personal property, or choses in action, as fully and as completely as said bank or the undersigned on behalf of the said bank could or might do in its or his own name. And shall also include the right to collect all funds due said banks, convert their assets into cash, and to deposit all funds and check out the same. This appointment to be effective upon the giving of a bond in the full penal sum of fifty thousand dollars, conditioned upon the faithful performance of his duties as such agent. This 23rd day of July, 1926. T. R. Bennett, Superintendent of Banks (seal). Executed in the presence of Luther Roberts, J. F. Kemp, N. P. Ga., State at large."

Sections 9 and 10, as mentioned in this document, and section 1 of article 7 are the only provisions of the banking act which could be construed as warrant for the appointment of any agent with power to issue executions for the enforcement of the liability of stockholders. The section last referred to merely provides that under certain circumstances a bank which has become subject to his administration may be taken possession of "by the superintendent himself or by a duly authorized agent." From what we have said in the second division of this opinion, we think it would be improper to enlarge the meaning of these provisions by a liberal construction; and it is perhaps true, as contended by the plaintiff in error, that the agent whose appointment is provided for in section 9 is not a general agent to assist in the liquidation of such banks, in general, as may be taken over by the superintendent, but is an agent who is expected to have part in the liquidation of a particular bank and whose appointment should be made for that specific purpose. It would seem also to be the law that until a bank has failed and its assets are subject to sequestration by the superintendent, there is no occasion for the appointment of an agent under any of the provisions referred to, and that in the meantime the authority of the superintendent to appoint such an agent is in abeyance. It is not necessary, however, to decide these questions in the present case, and we make no adjudication regarding them. The Farmers & Merchants Bank had failed and had been placed in the hands of the superintendent prior to the date of the appointment now under consideration. The power of attorney made reference to "all banks now . . in liquidation," and this was to include the Farmers & Merchants Bank of Sylvester, since the facts, as they existed at the time, were such as to bring that bank within such general description. There were special facts in existence authorizing the superintendent to appoint an agent, and while the agent so appointed was designated as a general agent, and while the power of attorney attempted to confer a general authority for which the statute may have made no provision, the act of the agent which is attacked in this case was not a general act relating to "all banks now or which hereafter may be placed in liquidation," but was a special act relating to a particular bank shown to have been in the superintendent's possession for the purpose of liquidation at the time of the making of such appointment. Even though the

power of attorney may have sought to confer greater authority than the superintendent could have conferred under the law, we think it is nevertheless valid so far as it included authority which the superintendent was authorized by law to delegate. Anything else may be rejected as surplusage. Furthermore, even assuming that it was necessary that the particular bank should be designated under the hand and official seal of the superintendent, the description of the subject-matter in the particular instrument was sufficient to furnish a key to the identification of the bank as to which the agent acted in issuing the execution. *Boyd* v. *Sanders,* 148 *Ga.* 839 (98 S. E. 490). It is immaterial that the agent may have been called a general agent and may have signed the execution as such, if his act in issuing it was not otherwise invalid.

If the person who issued the execution in this case was authorized to issue it at all, it was proper for him to do so in the name of the superintendent by himself as agent. Where an officer is authorized by law to appoint a deputy, it is generally the case that the deputy, on receiving the appointment, derives his authority from the law and not from the officer appointing him; and, therefore, acts requiring official signature, when done by a deputy, should be executed in his own official right and not in the name of the principal officer. *Ballard* v. *Orr,* 105 *Ga.* 191 (31 S. E. 554); *Biggers* v. *Winkles,* 124 *Ga.* 990 (53 S. E. 397). A different form of execution, however, would seem to be proper where the act is performed through an agent. In that case the power exercised is derived from the person or official from whom the agent received his appointment, and the accepted form of signature is that which was adopted in issuing the instant fi. fa. See *Ballard* v. *Orr,* supra; 2 C. J. 671. Under the agreed statement of facts, the trial court was right in rendering judgment in favor of the plaintiff in fi. fa. on each ground of the affidavit of illegality.

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*